**ÆTNA LIFE INS. CO. v. CASPER et al.**
**(No. 3122.)**

Court of Civil Appeals of Texas. Amarillo.
Nov. 28, 1928.

Ben P. Monning and Henry D. Akin, both of Amarillo, for plaintiff in error.

H. H. Smith and A. L. Shirley, both of Panhandle, for defendants in error.

RANDOLPH, J. There are 26 propositions presented for our consideration, in a brief of 114 pages of typewritten matter. We cannot incumber the minutes of this court, let alone the law reports, with an opinon of sufficient length to pass upon all of such propositions; but we will consider only such questions as control in the disposition of the case or which can be grouped for discussion.

Appellant contends that there was no proper pleading or legal evidence that defendant Joe Casper was an employee of Roxana Petroleum Corporation at the time he is alleged to have sustained the injury complained of, and that the court should have given plaintiff's requested peremptory instruction to find a verdict in its favor.

The defendant Casper, in his second amended original answer, in which he erroneously styles himself plaintiff, alleges as follows:

"That this plaintiff, Joe Casper, was on and prior to the said 21st day of February, A. D., 1927, an employee of and employed by the said Roxana Petroleum Corporation; and that he was an employee subject to, within the contemplation of, and under its terms to the benefits of the provisions of said Workman's Compensation Act, and that he was covered by said policy of insurance on the date of said injury.

"That on the said 21st day of February, A. D. 1927, and while engaged in the course of his employment with the said Roxana Petroleum Corporation in the County of Carson and State of Texas, the said plaintiff, Joe Casper, sustained certain personal injuries in the manner hereinafter set out;

"That while employed as a teamster and acting under the direction and control of the said Roxana Petroleum Corporation, the plaintiff, Joe Casper was directed by one Slim Vulgamore, an agent or employee of the Roxana Petroleum Corporation, to move a certain welding outfit from the place where it was located to a point where it was to be used. That the welder and welder's helper also employees of the Roxana Petroleum Corporation were instructed to accompany plaintiff, Joe Casper, and assist him in loading the said welding outfit; that the said welding outfit was loaded and that the plaintiff, Joe Casper, was then instructed to drive to the water tank so that the welding generator might be filled with water; that when the team was stopped at the water tank, plaintiff, Joe Casper, was instructed to wait until some hose was obtained with which to put the water in the generator; that while the welder's helper was gone in search of some hose, the generator "popped off" from some cause unknown to plaintiff, Joe Casper. This frightened the team and caused them to run away, and in reaching for the lines and attempting to stop said team, plaintiff was caught in front of the wagon between the double-trees and front of said wagon and dragged in that position for some distance until the team came to a stop. That plaintiff, Joe Casper, was caught in such a manner that his right foot and ankle were crushed and the bones of his right leg were crushed and broken to such an extent that he has not been able' to perform any labor since said injury, that he has been totally incapacitated to perform any kind or labor since said injury. That said foot and ankle have become stiff due to said injury, and that he will continue to be totally and permanently incapacitated to perform any kind of manual labor for the balance of his natural life on account of said injury. That prior to said injury plaintiff, Joe Casper, was a strong and able-bodied man capable of performing heavy manual labor, and did perform such work as a means of earning his living.

"That the said personal injuries which were sustained by plaintiff, Joe Casper, and which resulted in his total incapacity to work were so sustained in the course of, and arose out of his employment with the Roxana Petroleum Corporation, and were the direct and proximate result of such employment, and that such injuries were and are compensable injuries within the contemplation and under the terms of the Workman's Compensation Act of the State of Texas."

And, further, in his trial amendment, alleges as follows:

"Plaintiff further alleges that he was employed by the Roxana Petroleum Corporation for a period of approximately ninety-two days prior to the accident, and that the average daily wages of an employee engaged in the same class of work as plaintiff working substantially the whole of the year immediately proceeding in the same or similar employment was $5.00 per day, and that by reason thereof plaintiff's weekly wage as defined in said Workman's Compensation Act

was $28.84 per week and that the plaintiff, Joe Casper, is entitled to the sum of $17.31 per week for a period of 401 weeks, beginning February 21, 1927. That the plaintiff, Joe Casper has received nothing from said Ætna Life Insurance Company on account of said injury."

Joe Casper, defendant, testified substantially: That he is a teamster by occupation. That on the 21st day of February, 1927, he was employed as a teamster by T. Jordan, who paid his wages. That this employment was for a period of 93 days prior to February 21, 1927. That he worked on the Roxana gasoline plant as a teamster. That he was instructed by one Vulgamore what to do, where to haul things, where to pick up a line, and what was to be done on the general lease work. Vulgamore was the boss at the Roxana gasoline plant. He (defendant) was working for the Roxana company and reported to Slim Vulgamore every morning. He did not have instructions issued to him by Jordan during the day.

"As to my being instructed during the time I was working for the Roxana Petroleum Corporation by anyone else besides Slim as to what to do, there was some other bosses around the Plant that I got orders from, to do lumber hauling and one thing and another; they were bosses employed by the Roxana. I was at all times subject to orders from Mr. Vulgamore; I was under the direction and control of Slim Vulgamore at the Roxana Gasoline Plant. * * * On February 21, 1927, about a year ago, that morning I was hauling some pipe and finished up at noon and then I made a trip to a battery tank in the afternoon. As to what I was instructed to do about 2 o'clock on that day and by whom instructed, I drove up to the office to where Vulgamore was and he said he wanted a generator hauled to a certain place on the line and told me where the generator was and says, 'You get it over the road as quick as you can, because I want you to get it done before quitting time,' so I drove down to the boiler house."

It was during the time he was engaged in hauling this generator that the defendant was injured. On cross-examination, defendant testified further:

"I was on Jordan's pay roll at Roxana when I got hurt out there. Jordan was paying me. When I did a week's work, Jordan gave me my check. Jordan hired me. He is a teaming contractor and was a teaming contractor on the 21st day of February, 1927. He was engaged in having teams and drivers haul for various and sundry people. He had a barn there to keep his teams in and I would go to this barn and hitch up a team in the morning. The team belonged to Jordan, but Jordan did not tell me where to report to. There was only one time that Mr. Jordan told me where to report, it was the time I hired out to him; from then on I always went to the Roxana. He hired me and I was under his orders; he was the man that paid me. I never got any money from the Roxana during the month of February, 1927. I never worked for the Roxana. * * * As to how I drew my pay, whether weekly or by the day, I drawed my pay every time Jordan had it; drawed $20.00 or $30.00. He did not pay me exactly every week, but that was the way I was hired by Mr. Jordan. He was supposed to give me a check every Saturday night, but he didn't. He was supposed to pay me every time the Roxana paid him."

The witness Hector McArthur testified:

"My name is Hector McArthur, and I am a dairyman. On or about February 21, 1927, I was in partners with Mr. Jordan, a teaming contractor. We operated as such teaming contractors about that time around Roxana, and I was acquainted with the Roxana Petroleum Corporation out there. Some of them. I did not hire this man for something like ninety days prior to February 21st, 1927; Jordan hired him. I was not in Roxana about that date; I was in Wyoming. I came here on the 26th day of December, 1926, to the Roxana field. I knew Mr. Casper shortly after I came. He was driving a team for the Roxana, and was hired by our firm, by me and Mr. Jordan, at that time, and was driving a team for the Roxana. As to how it happened that we had him hired and he was driving a team for the Roxana, he would go up to the office every morning and they would send him out on the job on whatever they wanted him to do; they told him where to go and what to do. The Roxana hired this man of us and a team along with him. The way that he got into the employ or was driving a team for the Roxana, they came and asked for a team, and we sent him over there; they came and asked for a team and a man. We did not direct this man to do something when he got over there. They wanted a team and a man, and we turned a team and a man over to them; but we did not give the man any orders as to what to do out there on the lease, as we had no control over him after he left the stable and went over to the Roxana.

"I knew a man with the Roxana by the name of Slim Vulgamore, but I am not sure what position he held out there.

"Mr. Jordan and I do not owe Mr. Casper anything that I know of. I do not know whether Jordan settled with him, or not. I don't know whether Jordan settled with him, as I never handled any of that end of it. I know who paid Mr. Casper; Jordan paid him. Sometimes he would pay him twice a month and sometimes once a month; he did not pay him by the week. It was customary to pay every two weeks, but I do not know whether or not Mr. Jordan paid Mr. Casper anything after the injury. I do not know whether Mr. Jordan paid the doctor bill for Mr. Casper, or not, and I couldn't say as to that; he gave

him his board and room; that is, he boarded and roomed there, and after he got hurt, Mr. Jordan furnished a nurse and food for him, but I don't know whether he gave it to him or not; he may have charged him for that. I do not know of my own knowledge how the injury occurred, as I wasn't there at that time; I was at Borger at that time; I was in partnership with Mr. Jordan about six or seven months. Mr. Jordan is at Gunter, Texas, now, which is in Grayson County. I don't know just where it is. I do not know that Mr. Jordan paid Mr. Casper but he was supposed to be drawing his pay from Mr. Jordan. I did not hire this man, but I was there when he was hired in September, 1926. I testified that I came out here in December, 1926; but he was hired in Wyoming by Mr. Jordan. He was hired at Casper, Wyoming, in September, 1926. Jordan and I were partners out in Wyoming, and I was present at the time Casper was hired. None of the Roxana men were present then.

"Mr. Casper drove mine and Jordan's teams.

"Mr. Jordan told me that he was getting workmen's compensation insurance. I never did ask him whether he got it or not. He came back to Wyoming in December and I asked him about it and he said he was getting it, but I don't know whether he carried it or not. I didn't have nothing to say about the partnership business at all; I was a silent partner. He run the business. He kept the barn where he kept his teams and bunkhouses for his men.

"A teaming contractor is a regular business in the oil fields. As to it being a recognized separate trade, all teaming isn't contracted, but there is such a thing recognized in the oil fields as a teaming contractor. Some of these oil companies have their own teams, and some teams they hire by the day. They hire some of these teams by the day from Mr. Jordan and some of them by the job.

"Mr. Jordan told Mr. Casper to report to the Roxana people. I guess Jordan told him what team to take and what wagon to take. Jordan or Slim Vulgamore either one had a right to fire him. I know that Slim Vulgamore had a right to fire him; he fired one skinner; it wasn't Casper, but it was a fellow we sent up to take Casper's place. He fired him; I wasn't there but he sent him in. He did not send him to report to Jordan, but he told him he wouldn't need him any more. He never said he wouldn't need the team any more. I don't know what he told him, as I wasn't there but this man told me what he told him. It was not a fact that he sent this man back to Jordan; he sent him to camp; he didn't specify any one to report to.

"Mr. Jordan did not have the right to send Mr. Casper out to any other camp he wanted to as long as he was working for the Roxana; if he had sent another man up to the Roxana, I don't think it would have been all the same with the Roxana. Their contract was not for a team and a man; they said they wanted Casper; Slim said he wanted Casper; he told Jordan that, but I did not hear him.

"If Casper had driven the team too hard, I suppose Jordan would have had a sayso there.

"The difference between our teaming contract and one just hired out to another man to do work—where we contract any work we reserve the sayso over the teams and where they hire the teams, they have the sayso. We did not reserve any sayso in this case. I don't know whether or not Mr. Jordan paid Mr. Casper some every week, or not. I don't know whether he paid some every week or every two weeks.

"Mr. Jordan and Mr. Casper came down to the Roxana field before I did; I stated that we hired him out in Wyoming. They came down into this country at the same time, and I stayed out there a while after they came down here.

"I don't have any interest in this case one way or another. I don't think I have the interest in it that if the insurance company are found not liable that Jordan and I will be held. It would make some difference to me whether or not Casper would turn around and sue Jordan and me. I really have no interest in the case.

"I did not hear the trade between Jordan and Vulgamore, by which these teams were turned over, but I know that Jordan didn't reserve any sayso at the time, in this particular case. I am sure of that. I wasn't there and heard it; I was in Wyoming at the time; I don't know what the terms of the trade were.

"After I came down here, I was acquainted with the way this team was turned over, and I have reference to this team after I came down here. I didn't mean to connect that up with this trade over in Wyoming.

"I stated that I came down here in December, and after I came down here Mr. Casper was still working out on the Roxana lease. He came into camp every night and went out every morning. He stayed there in our camp. I was there and saw him come in at night and go out in the morning. I never did give him any orders as to how to work out there on that lease; I had nothing to do with that, whatever, but I know that to be a fact. If Jordan had given it, I would have known it. I did not give any orders; I was just a silent partner, like I testified a while ago.

"When this company hired a team and a man to do some work there, as far as Jordan and I were concerned, we had nothing further to do with the team and the man until the oil company got through with him. The man did not have to report back there to the barn. He kept the team at the barn; he had to bring the team back if he was close to the

barn. If we was around Roxana, we would keep the teams in the barn; if we weren't he would keep them wherever he was at. Casper had to take the team wherever we kept them. As to his having to go wherever we told him to go, I never told him to go anywhere, but I don't swear that Jordan didn't tell him to go anywhere.

"It is a fact that Mr. Casper was working for Mr. Jordan, and wherever Mr. Jordan told him to go to work, he went to work.

"Under Mr. Jordan's orders he was not to go down there and work nine hours a day; he did work for us nine hours a day; that is what we were paying him for. He was supposed to put in that time for us, and after he got through he was supposed to come back and unhitch the team and put the team in the barn. The employees of Jordan and me had full control of the teams; they did the driving and did the loading.

"Mr. Casper and those men whom we hired out to the Roxana, they left our barn and came back to our barn, but I do not mean to say by that that we had any control over them during the day out there with the teams. I stated that the teams were brought in at night and taken out in the morning; but we didn't have any supervision or control over him during the principal part of the day."

The plaintiff tendered to the trial court, for submission to the jury, the following special issue: "Was the claimant, Joe Casper, an employee of the Roxana Petroleum Corporation at the time of his alleged injury? Answer Yes or No." This special issue was refused by the trial court, and no issue whatever presenting that question was submitted to them. In addition to the special issue so tendered by plaintiff, plaintiff also excepted to the main charge given by the trial court, because it fails to submit to the jury any issue whether or not the defendant was an employee of the Roxana Petroleum Corporation.

■ The trial court could not under the law make a finding of such employment in lieu of a finding by the jury; hence, there can be no presumption of such finding.

■ The question whether Jordan was an independent contractor for whom the defendant was working, or whether, under the circumstances detailed above, he (Casper) was an employee of the Roxana Petroleum Corporation, is a matter which should have been decided by the jury. We cannot, under the recited facts, conclude as a matter of law that he was an employee of either.

This question has been thoroughly discussed by Justice Jackson, of this court, in Maryland Casualty Co. v. Scruggs (Tex. Civ. App.) 277 S. W. 768; Texas Employers' Association v. Owen (Tex. Civ. App.) 291 S. W. 940; Hardin v. Rust (Tex. Civ. App.) 294 S. W. 625, 630; Texas Employers' Association v. Eubanks (Tex. Civ. App.) 294 S. W. 905, 907.

The plaintiff assigns as error that there were no proper pleadings and no legal evidence to support the finding of the jury, in answer to the court's special issue No. 5, that $5 per day was the average daily wage of an employee of the same class as the defendant, working substantially the whole of the year immediately preceding February 21, 1927, in a similar employment in the same neighborhood, because this was not a proper test for determining the average weekly wage of the defendant in this case, he having worked for more than a year as a teamster, and is not sufficient upon which to base judgment.

The pleading setting out the weekly wage of the defendant is contained in the trial amendment hereinabove set out. To this pleading the plaintiff excepted for the reason that it does not allege a proper basis for arriving at the average weekly wage of the defendant, as same is defined by the Workmen's Compensation Law of Texas.

The defendant testified that he had been in the teaming business for years. However, he also testified that he had been at work for the 92 days preceding this injury, at this particular job, having come over to that job from the oil fields where he had been working. It does not appear definitely that the defendant had been continuously at work for the year prior to the injury. His evidence appears to indicate that he was testifying generally for the purpose of identifying his working occupation. The defendant's proof shows him to have actually been at work for the 92 days prior to the injury. The testimony of the witness Welch with reference to the wages paid people in a similar employment shows that he was familiar with the wage paid men of the defendant's class in and around the county at the time of the injury, but does not show that he was acquainted with such wage for the year preceding the injury, in that he was not in the neighborhood at the time, having come there from Houston, and only testified as to that on information.

Article 8309 (Rev. St. 1925), defining "average weekly wage," provides that where an employee shall have worked in the employment in which he was working at the time of the injury, whether for the same employer or not, substantially the whole of the year immediately preceding the injury, his average annual wages shall consist of 300 times the average daily wage which he shall have earned in such employment during the days when so employed. If the injured employee shall not have worked in such employment during substantially the whole of the year, his average annual wages shall consist of 300 times the average daily wage which an employee working substantially the whole of such immediately preceding year in the same or a similar employment in the same or in a neighboring place shall have earned in such employment during the days when so em-

ployed. When, by reason of the shortness of the time of employment, etc., this does not furnish the test, then it is provided such wage shall be computed by the board in any manner which may seem just and fair to both parties.

The trial court submitted to the jury: "What do you find was the average daily wage of any employee of the same class as Joe Casper, working substantially the whole of the year immediately preceding said Feb. 21, 1927, in a similar employment in the same neighborhood?"

The evidence is unsatisfactory in showing the employment of the defendant for the time preceding the injury, and, in view of another trial, we suggest that this be shown more satisfactorily for the information of the court in properly charging the jury.

■ The conditions of the trial largely control the court in exercising its discretion in permitting leading questions, and we cannot say that this discretion was abused under the facts of this case.

■ Answers of the witness, such as "he was under the direction of Slim Vulgamore," in the matters about which the witness was questioned, were statements of fact and not conclusions of the witness.

We have carefully considered the various propositions and assignments, and, except as indicated, overrule same. Because of errors indicated, the trial court's judgment is reversed, and the case is remanded to that court for a new trial.