## McLEOD v. SECURITY UNION INS. CO
### (No. 7388.)

Court of Civil Appeals of Texas. Austin.
Oct. 30, 1929.

Rehearing Denied Nov. 13, 1929.

Chas. Gibbs and Glenn R. Lewis, both of San Angelo, for appellant.

Touchstone, Wight, Gormley & Price, of Dallas, for appellee.

McCLENDON, C. J. Appeal from a judgment upon a directed verdict denying appellant recovery in an action under the Employers' Liability Law (Rev. St. 1925, arts. 8306—8309).

Appellee was the insurer of L. E. Whitham & Co., a corporation, and the only question the appeal presents is whether the evidence would support a finding that McLeod was an employee of the insured.

The evidence will admit of the following findings: Whitham & Co.—engaged in constructing street paving in San Angelo—controlled a gravel pit on the Concho river some 4½ miles from the paving work, and reached by a private road extending to the highway. The road was closed when not in use, and was kept repaired by Whitham & Co. Menefee had a verbal contract with Whitham & Co. to truck gravel from the pit to a washing apparatus where the paving was being done. He drove a truck himself and employed five other truck drivers, including McLeod, furnishing the trucks which he kept in repair and supplied with gasoline and oil. McLeod's contract with Menefee was to drive a truck at $100 per month, $60 in money and $40 in board. His services, however, were to be acceptable to Whitham & Co., and if he lost as many as four or five days during the month he was paid at the rate of $2 per day net, or $3.33 gross, $1.33 being deducted as board. Whitham & Co. paid Menefee semimonthly on a yardage basis. The gravel was taken from the Concho river by machinery, hoisted into a chute, and from this was loaded into the

trucks. The entire operation of loading was under the direction and control of Whitham & Co.'s employees, and the same was true of the unloading.

The following quotation from the testimony of Barnes, Whitham & Co.'s foreman in charge of the loading, is a fair summary of plaintiff's evidence concerning the details of the loading: "I had instructions from the superintendent of L. E. Whitham & Co. as to how the trucks should be loaded. The superintendent gave me orders that if any of them could not pull out what I put on the trucks and that if they could not back in there without holding up the other trucks to send them to the L. E. Whitham & Co. office. If the boys could not or would not load their trucks like I said I was to send them to the office. Some of the boys would stop at the top of the hill and shovel some of the gravel off and the superintendent said if I caught any of the boys doing that to send them to the office. I was instructed to put on all the gravel on the trucks that would stay on the beds. As the boys would come in I would give them instructions how to spot their trucks out there and lots of them would drive in there sidewise and park so the trucks could not get in and some of them would drive too far there and stuck and lots of them would drive up with their endgates open and when they pulled up the gravel would fall over the hopper and it would delay the other trucks and that is one of the reasons that I wanted them to keep their endgates closed and not hold up the rest of the trucks and delay the work of L. E. Whitham & Co. There were two 3x12's on each side for the trucks to run on when they backed in there to load. They were getting that gravel out of the river and water would still be in the gravel and it would be as wet as if it had rained and the trucks would go down after they got off the boards and delay L. E. Whitham & Co. in their work, because they needed the gravel. It was part of L. E. Whitham's instructions that the loading place be kept in condition so that the trucks would not bog down. I kept one or two men there all the time to work the road. I told the boys if they could not stay on these plans that I had orders to send them to the office. Some of the boys when they got out of my sight would throw some of the gravel off their trucks and I reported this to L. E. Whitham & Co. and the superintendent told me that if I caught any more of them doing this to send them to the office and I told the boys if I caught them shovelling any more gravel off their trucks I would send them to the office, and that put an end to it. * * * The reason I sent one of Mr. Menefee's drivers to the office was because every time we loaded his truck it would dump and hold the other trucks up and delay the work, and we had to wait until all that gravel was shovelled out of the way and it would delay L. E. Whitham

& Co.'s operations. The condition of that truck was a hindrance to the operation of hauling gravel and that is the reason I sent him to the office and I told him if he did not get it fixed to not come back and he got it fixed and came back, but I sent three or four others in who did not come back. The reason I sent the others in was because they laid off too much; they broke down all the time and we had enough trucks without them and I had orders to send them in."

Virtually the same character of control and direction was exercised at the point where the gravel was unloaded. We do not deem it necessary to give the details of this operation.

With reference to the quantity loaded on each truck Whitham & Co.'s manager testified: "In arriving at the amount of yardage the trucks were measured as to capacity by the checker, and those trucks were supposed to haul so much each time, if loaded properly. Every time the trucks were loaded we did not have to measure if it had been properly loaded. Of course if it was a half load, he would just use his judgment if the trucks came in and if the trucks were overloaded, that was their hard luck. It was to the interest of L. E. Whitham & Co. that these trucks come in each time with a full load. If the trucks happened to be overloaded, the report went in as just a full load and if it happened to have more than a full load L. E. Whitham & Co. profited by that."

Whitham & Co. determined what days and at what hours gravel was to be hauled. The truck drivers, unless notified to the contrary, would report early in the morning at the pit. If no gravel was to be hauled, they would be sent away. McLeod had reported for work, was told there would be no hauling that day, and was traveling the private road leading from the pit on his return home when his truck turned over, inflicting the injuries in suit.

The question which the evidence presents—whether McLeod was an employee of Whitham & Co.—has been frequently before the courts of this and other states, and the general principles which control its determination are well settled by adjudicated cases. We could add nothing to the law upon the subject by extended discussion or review of authorities. We merely refer, in this connection, to two recent decisions of this court and the authorities therein cited. Southern Surety Co. v. Shoemake, 16 S.W.(2d) 950; Ætna Life Ins. Co. v. Culvahouse, 10 S.W.(2d) 803.

The facts here present a much stronger case of liability than those of the Shoemake Case, in which a writ of error has been granted by the Supreme Court. If we felt that a decision in that case would of necessity control the case at bar, we might withhold decision pending a decision by the Supreme Court in the Shoemake Case. But we regard the instant case as presenting important elements not common to the two cases, and therefore a

decision in the Shoemake Case adverse to our holding therein would not necessarily control the case at bar.

█ The ultimate test generally accepted in this class of cases is that of authoritative control of the important details of the work. The Supreme Court of the United States, in Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252, 254, 53 L. Ed. 480, states the rule thus: "To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work. Here we must carefully distinguish between authoritative direction and control, and mere suggestion as to details or the necessary co-operation, where the work furnished is part of a larger undertaking."

The right to employ and discharge, while usually regarded as important, is nevertheless but evidentiarily so. To quote further from the Anderson Case: "In many of the cases the power of substitution or discharge, the payment of wages and other circumstances bearing upon the relation are dwelt upon. They, however, are not the ultimate facts, but only those more or less useful in determining whose is the work and whose is the power of control."

The parties have cited several Texas cases which present facts analogous in some respects to those at bar. But in each are elements present or wanting of sufficient importance to distinguish it from the case at bar. We cite these cases without discussion: King v. Galloway (Tex. Com. App.) 284 S. W. 942; Ætna Life Ins. Co. v. Casper (Tex. Civ. App.) 11 S.W.(2d) 594; Lumbermen's Ass'n v. Carter (Tex. Civ. App.) 19 S.W.(2d) 346.

As we interpret it, the evidence is quite ample to support a finding that Menefee merely supplied trucks and truck drivers to do the work of Whitham & Co. under its complete direction and control and to its entire satisfaction; that Menefee exercised no control whatever over the drivers in so far as the details of the work were concerned, and that this right of control in Whitham & Co. extended even to the right of discharge for unsatisfactory service.

Of course, Whitham & Co. could not discharge any one from the general employ of Menefee; but the evidence is clearly sufficient to support a finding that it both reserved and exercised the right to exclude from the work any truck driver who failed to satisfy it, and this we think was tantamount to discharge from the particular employment whether or not there was discharge generally from Menefee's employ. The contract between Menefee and McLeod may reasonably be construed to cover this contingency in the stipulation that the employment should continue only so long as McLeod satisfied Whitham & Co.

█ We are of opinion that the facts presented are at least evidence that McLeod was an employee of Whitham & Co., and that the issue should not have been withdrawn from the jury. If he was such employee the injuries complained of were received in the course of his employment. Employers' Liability Corp. v. Light (Tex. Civ. App.) 275 S. W. 685 (writ refused).

The trial court's judgment is reversed, and the cause remanded for further trial.