## MARYLAND CASUALTY CO. v. KENT et al.*
### (No. 1198.)

(Court of Civil Appeals of Texas. Beaumont. March 24, 1925. Rehearing Denied April 15, 1925.)

**1. Master and servant ⬤⟳367—Local agent to sell oil held "employee" and not "independent contractor."**

Local agent of oil company, under duty to receive all company's products shipped which were to remain property of company until actually sold, and who was prohibited from making sales except for cash, unless with express permission of company, which fixed prices from which agent could not deviate, he being required to make regular written monthly reports, and not permitted to deduct commissions before remitting proceeds of sales, *held* employee within meaning of Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82), and not independent contractor.

**2. Master and servant ⬤⟳367 — "Independent contractor" distinguished from "employee."**

"Independent contractor" is one who contracts to do a specified piece of work, has right to adopt his own means and methods, and is not controlled as to details by the employer, but is wholly independent except as to final results; whereas an employee, as term is used in Employers' Liability Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), is controlled in material respects as to manner and method or means to be adopted in carrying out contract.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Employé; Independent Contractor.]

**3. Master and servant ⬤⟳405(4)—Finding employee driving truck was killed in course of employment sustained.**

In proceeding under Employers' Liability Act (Vernon's Ann. Civ. St. Supp. 1918, arts.

---

5246—1 to 5246—91) for compensation for death of local agent of oil company, occurring when he was driving, delivery truck containing oil drum near oil company's warehouse in evening, evidence *held* sufficient to sustain finding that he was acting within scope of his employment.

4. Evidence ⊙⟶121(12)—Testimony as to conversation with deceased before he left house on trip which resulted fatally, relevant as circumstance showing act within scope of employment and not hearsay.

In proceeding under Employers' Liability Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91) for compensation for death of local agent of oil company while driving delivery truck, testimony of his wife that she told him there was an order in the mail for oil, and that he stated he would get his mail, whereupon he left the house, and she never saw him again, *held* relevant and not hearsay, being circumstance tending to show he was acting within scope of employment at time of death.

Appeal from District Court, Jasper County; V. H. Stark, Judge.

Action by the Maryland Casualty Company to set aside an award of the Industrial Accident Board in favor of Mrs. Clarice Kent and others, claimants, for the death of J. M. Kent. Judgment for claimants, and the insurer appeals. Affirmed.

Baker, Botts, Parker & Garwood, of Houston, for appellant.
Smith & Lanier, of Jasper, for appellees.

HIGHTOWER, C. J. This controversy was initiated by the appellees, Mrs. Clarice Kent, widow of J. M. Kent, deceased, and their five minor children, by their filing a claim with the Industrial Accident Board of this state for compensation under the Employers' Liability Act of this state (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), because of the death of the husband and father, J. M. Kent. It was the contention of the claimants before the board that J. M. Kent, at the time of his death, was an employé of the Gulf Refining Company, and that he met his death in the course of his employment, and that, therefore, under the act, claimants, who are admittedly the only beneficiaries of the deceased, were entitled to compensation as provided by the act. The appellant, Maryland Casualty Company, who was the defendant before the board, contested the claim, and denied liability on two grounds: (1) That J. M. Kent was not an employé of the Gulf Refining Company, as the term "employé" is used in the Employers' Liability Act of this state; and (2) that if J. M. Kent was an employé of the Gulf Refining Company, as contemplated by the act, nevertheless the defendant was not liable, because Kent did not meet his death in the course of

his employment with the Gulf Refining Company, but was, at the time, performing services for himself, or was in the pursuit of his own private business, and that, therefore, defendant was not liable. The hearing before the board resulted in an award in favor of the claimants, the appellees here, and the appellant in due time, and after due notice, filed this suit in the district court of Jasper county to set aside the award, and the appellees, after answer thereto, filed the usual cross-action for compensation. The case was submitted to the jury upon special issues, and resulted in a verdict and judgment in favor of appellees, from which this appeal is prosecuted by the Maryland Casualty Company.

Appellant advances in this court two assignments, under which it contends the judgment should be reversed and rendered in its favor. Its first contention is, in substance, that the undisputed evidence showed that the deceased, Kent, was not an employé of the Gulf Refining Company at the time of his death, as the term "employé" is used in the Employers' Liability Act of this state; and second, that the evidence showed conclusively that deceased was not engaged in the performance of any service for the Gulf Refining Company at the time of his death, or, in other words, that he was not in the course of his employment at the time of his death, even if it should be conceded that he was an employé of the Gulf Refining Company within the contemplation of the act. These contentions will be disposed of in the order in which they are made.

The relations between the deceased and the Gulf Refining Company were evidenced and fixed by the following written contract, which, it was stipulated by the parties, was in full force and effect at the time of Kent's death, to wit:

"This memorandum of agreement, made and entered into this 1st day of January, 1920, by and between the Gulf Refining Company, of Port Arthur, Texas, party of the first part, and J. M. Kent, of Jasper, Texas, party of the second part, witnesseth:

"The party of the second part agrees to rent a warehouse at Jasper, Texas, suitable for the storage of oils, at ten ($10.00) dollars per month, rental of said warehouse to be paid by the said party of the first part.

"Party of the first part agrees to ship to party of the second part lubricating oils, illuminating oils, and gasoline, in carload lots, which shipments are to be received by the party of the second part and sold by him at prices named by party of the first part—all sales of such oils to be for cash, or, if on credit, only to such parties as are acceptable to party of the first part, and upon terms authorized by them.

"Where first party orders second party to sell on credit, second party shall deliver a signed receipt, or in case the oil is shipped out of the city of Jasper, Texas, second party will deliver an original bill of lading from the rail-

road company, which will constitute a receipt.

"Party of the second part is to be responsible to the party of the first part for all goods shipped to him, and is to account for all sales in accordance with above paragraph, sending weekly a statement showing all sales made and remitting weekly to party of the first part at their Houston, Texas, office, all moneys received by him from sale of above named goods.

"Second party shall render to the party of the first part statement on the first day of each month, showing in detail the goods on hand.

"Second party agrees to pay all drayage and delivery charges, and collect all empty drums and barrels and ship same back to first party as ordered.

"It is strictly understood that all goods shipped to party of the second part by party of the first part are the property of the party of the first part until sold.

"On or about the first of each month, party of the first part will send to party of the second part a statement showing the sales made by party of the second part during the preceding month, remitting party of the second part commission earned on such sales, said commission to be as follows:

| | Kerosene and Gasoline | | Eng. | Kero. | Solar | |
|---|---|---|---|---|---|---|
| Rate of Commission in Cents per Gallon Unless Otherwise Specified. | Bulk. | Pkgs. | Bulk. | Pkgs. | Bulk. | Pkgs. |
| City deliveries... | 2 | 2 | 2 | 2 | 2 | 2 |
| Country wagon deliv. .......... | 3 | 3 | 3 | 3 | 3 | 3 |
| Local railroad deliv. .......... | | 1½ | | 1½ | | 1½ |
| Carload deliveries in packages | | ½ | | ½ | | ½ |
| Carload deliveries in tank cars | ¼ | | ¼ | | ¼ | |

Lubricating oils: Ten (10%) per cent. of invoice price.

Axle greases: Fifteen (15¢) cents per case.

Bulk greases: Five (5%) per cent. of invoice price.

"Party of the first part reserves the privilege of making shipments from its stock of goods in hands of second party, and second party agrees to fill such orders as may be sent them by party of the first part—no commission to be allowed party of the second part on such shipments, but first party will pay second party twenty-five (25¢) cents per barrel for drayage and clerical work in making such shipments.

"This contract may be terminated by either party upon ten days' written notice to the other party, and upon such termination each party shall settle with the other in full, any and all amounts which may be due by either party to the other.

"This contract is signed in triplicate and is effective only when approved by vice president or general manager of sales and distributing department. Gulf Refining Company, by [Signed] C. Kerr, District Sales Manager. Jeptha Monroe Kent [Signed].

"Approved: [Signed] F. W. Hartman, General Manager of Sales and Distributing Dept."

The above contract was entered into between Kent and the Gulf Refining Company on January 1, 1920, and Kent met his death on December 6, 1923, but it is admitted by the parties here that there had been no material change in the contract up to the date of Kent's death, and no change at all except that after the written contract was entered into, the Gulf Refining Company built its own warehouse at or near the town of Jasper, and Kent thereafter ceased to rent a warehouse for the company, as had first been provided in the contract.

Appellant strenuously insists that the above contract between deceased and the Gulf Refining Company, when properly construed, shows conclusively that Kent was not an employé of the Gulf Refining Company at the time of his death, but, on the contrary, that he was an independent contractor, and that therefore appellant, who admittedly was carrying insurance covering all of the employés of the Gulf Refining Company, was not and is not liable for compensation in this case.

The facts as developed upon the trial were not in dispute in any material respect, the evidence showing that the deceased, Kent, had regularly performed his duties to the Gulf Refining Company, as fixed by the contract, from its date up to his death. The evidence further shows, however, that Kent also carried on, in the town of Jasper, a drayage business of his own, with which the Gulf Refining Company had no connection in any respect.

[1] In order to dispose of appellant's first contention, it is necessary for this court to determine whether the undisputed facts in this case showed that Kent was an employé of the Gulf Refining Company in contemplation of our Workmen's Compensation Act, as claimed by appellees, or whether he was an independent contractor. By section 1 of part 4 of the act, an employé is defined as follows:

" 'Employé' shall mean every person in the service of another under any contract of hire, expressed or implied, oral or written." Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82.

In discussing this definition, the Commission of Appeals of this state, in the case of Shannon et al. v. Western Indemnity Co., 257 S. W. 522, used this language:

"We think the term 'employé' as used in this act may be said to have a broader and more liberal meaning than the word 'servant,' as that term has been generally understood, in this, that it was intended to include all those in the service of another whether engaged in the performance of manual labor, or in positions of management and trust, and whether being paid wages or a salary, so long as they remained under the ultimate control of the employer. However, whatever the position occupied by the person employed, he must, in order to come

within the provisions of the law, be 'in the service of another.' This makes it necessary to look beyond the mere language of the statute and to determine the import of the words 'in the service of another' in accordance with recognized legal standards and definitions. The authorities seem to be practically in accord in holding that to constitute one an 'employé' in the meaning of the compensation laws, there must exist between the parties the relation of master and servant, in the broad sense that the one has the right of ultimate control and direction over the other. When one is employed by another, it·may be generally said to be in the relation of servant to master, or as an independent contractor. This being true, the courts in nearly every instance have undertaken to determine the relation of the person employed by another by first deciding whether or not such person was an independent contractor. If he was found not to be such under all the facts and circumstances, then he was classed as a servant or employé of his employer. ,If, under the facts and circumstances of this case, Shannon is found to be an independent contractor, as tested by the recognized legal rules and standards defining that relation, it follows as a matter of course that he was not an employé of Simmons."

The court, in the Shannon Case, then proceeds to approve the following definition of a contractor:

"A contractor is any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details. The true test of a contractor would seem 'to be that he renders service in the course of an independent occupation, representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished."

And further, in the Shannon Case, this holding was cited with approval:

"Where the undertaking of the person employed was for the performance of a certain description of. work during a definite or indefinite period, the independent quality of the contract may be inferred from the two circumstances that he was engaged in a distinct and generally recognized employment, and that his stipulated remuneration was either a gross sum of money, or an amount to be determined with reference to a quantitative standard."

In Honnold's Compensation Law, vol. 1, p. 208, the author says:

"The Compensation Law does not apply where the injured person is an independent contractor and the relation of employer and employé does not exist. It is not possible to lay down a hard and fast rule or state definite facts by which the status of men working and contracting together can be definitely defined in all cases, as employés or independent contractors. Each case must depend on its own facts. Ordinarily no one feature of the relation is determinative, but all must be considered together. A contractor is ordinarily one who carries on an independent employment and is responsible for the results of his work, one whose contract relates to a given piece of work for a given price. These characteristics, however, though very suggestive, are not necessarily controlling. Generally speaking, an independent contractor is one who assumes an independent employment and contracts to do a piece of work according to his own methods without being subject to the control of his employers, save as to the results of his work."

In 26 Cyc. pp. 1546, 1547, it is said, in substance, that an independent contractor is one who, carrying on an independent business, contracts to do a piece of work according to his own methods, and without being subject to the control of his employer as to the means by which the result is to be accomplished, but only as to the result of the work.

In Sherman & Redfield on Negligence (6th Ed.) p. 396, it is said:

"In actual affairs an independent contractor generally pursues the business of contracting, enters into a contract with his employer to do a specified piece of work for a specified price. * * * The one indispensable element to his character is that he must have contracted to do a specified work, and have the right to control the mode and manner of doing it."

In Cunningham v. Railway Co., 51 Tex. 503, 32 Am. St. Rep. 632, the Supreme Court of this state used this language:

" 'He is deemed the master who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of the work, but in all its details.' * * *

"In the second relation, that of employer and independent contractor, there is no such control and direction by the employer over the servant in the details of the work.

"The true test * * * by which to determine whether one who renders service to another does so as a contractor or not, is to ascertain whether he renders the service in the course of an independent occupation, representing the will of his employer only as to the result of the work, and not as to the means by which it is accomplished."

In Cockran v. Rice, 26 S. D. 393, 128 N. W. 583, Ann. Cas. 1913B, 570, the Supreme Court of South Dakota said:

"A test of the relationship between the employer and the employé is the right of the employer under the contract to control the manner and continuance of the particular service and the final result. No single fact is more conclusive as to the effect of the contract of employment, perhaps, than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself."

In 16 Am. & Eng. Ency. Law (2d Ed.) p. 187, it is said:

"Generally speaking, an independent contractor is one who, in rendering services, exercises an independent employment or occupation, and represents his employer only as to the results of his work, and not as to the means whereby it is to be accomplished. The word 'results,'

however, is used in this connection in the sense of a production or product of some sort, and not of a service."

[2] From the foregoing authorities, it would seem that the supreme and surest test for determining whether one was an independent contractor or an employé or servant of another would be to ascertain whether the person employed was to do a specified piece of work or perform a specified service, and whether in doing so he was to adopt his own means and method of performing the service and whether in performing the service he was not to be under the control of the employer as to details, but only as to the final result of the work undertaken. If a person contracts to do a specified job or piece of work for another and has the right under the contract to adopt his own means and methods of accomplishing the work and is not to be controlled as to details by the employer, but is wholly independent of him except as to final results, then such a person is, in our opinion, in contemplation of law, an independent contractor, and not a servant or employé as those terms are used and understood in our Compensation Law. If, on the other hand, a person enters into a contract to perform any character of service for another, and in carrying out the contract is to be controlled in material respects as to the manner and method or means to be adopted in carrying out the contract, then such person is, in our opinion, an employé, as that term is used in our Employers' Liability Act, if the construction of the term "employé" as made by the Commission of Appeals in the Shannon Case is correct.

Now, we will mention briefly the terms of the contract between the Gulf Refining Company and the deceased, Kent, with a view to reaching a conclusion as to whether or not Kent, in performing the service contemplated by the contract, was to be under the control of the Gulf Refining Company in carrying out the material provisions of the contract. In the first place, it appears from the contract that the Gulf Refining Company was to furnish a warehouse, in the town of Jasper, or right near there, to be kept and managed by Kent for the company for the storage of oil, gasoline, etc., manufactured by the company at Port Arthur, Tex. It was Kent's duty, under the contract, to receive and store all of the company's products that were shipped to him at Jasper, and it was provided by the contract that the oil, gas, etc., so shipped was to remain and be the property of the company until actually sold by Kent in accordance with the terms of the contract. Kent was expressly prohibited by the contract from making any sales of the company's products from the company's warehouse except for cash, and in no instance could he make a sale on credit without express permission from the company. The price of the different grades of oil and gas were fixed by the company, and Kent had no authority to deviate in any respect from these terms and prices. All containers in which the oil was shipped to Kent, such as barrels, drums, cans, etc., when emptied by sales, were to be gathered and taken care of by Kent and returned to the company at Port Arthur. Kent, under the terms of the contract, obligated himself to make regular written reports monthly to the company at Port Arthur, showing all sales made by him of the company's products, and the details in connection therewith. For his services in handling the company's products under the terms of the contract, he was to receive certain specified commissions upon sales made by him, but he was not permitted to deduct his commissions before making remittance to the company of the proceeds of sales. He was compelled to remit to the company regularly, at the dates specified in the contract, the gross proceeds of all sales made by him, and the company was to determine what commissions Kent was entitled to receive from the reports made by him, and would remit such commissions as it determined him to be entitled to.

The evidence adduced upon the trial showed that Kent, in addition to his employment with the Gulf Refining Company, conducted a drayage business around the town of Jasper, with which the company was not connected in any manner, and in which it had no interest; that Kent had two automobile trucks, and both of these belonged to him individually, and at times he used them both in connection with his duties in selling and delivering the company's products, and the evidence shows that all expense of handling these trucks was borne by Kent himself. It is also true, as shown by the contract between Kent and the Refining Company, that he was not required to work any particular number of hours per day, or number of days per week, or weeks per month, in handling the company's products and selling them around Jasper, but we think that it should be held that it was in contemplation of the parties to the contract that Kent should use reasonable diligence and efforts in carrying out his contract to sell the company's products, and this record shows that he did so.

Construing all the provisions of the written contract, as we have copied it above, between Kent and the Gulf Refining Company, and the evidence adduced upon the trial showing Kent's performance of his part of the contract, we have reached the conclusion under the authorities as we understand them, that Kent was not an independent contractor, as contended by appellant here, but that he was an employé of the Gulf Refining Company, as that term was construed by the Commission of Appeals in the Shannon Case, supra. We shall not undertake to discuss

the facts in the Shannon Case, because they will fully appear from the report of the decision, but it is our opinion that, instead of the Shannon Case being authority in support of appellant's contention here, it is, when carefully considered, authority in support of the contention of appellees that Kent was an employé of the Gulf Refining Company at the time of his death. He certainly was in the "service of another" under very specific terms of a written contract, by which, as we conclude, Kent was controlled in practically every material particular in carrying out the contract. The contract was not one for the performance of some specified piece of work, in which the Gulf Refining Company was interested only in the ultimate result, but it was a contract for services to be performed by Kent in carrying on the very business in which the Gulf Refining Company was engaged; that is, the sale of oil and gas, etc., manufactured for sale by the Gulf Refining Company. It is true that the Gulf Refining Company was not physically present at Jasper to direct and see that Kent carried out the provisions of the contract, but that fact is immaterial in determining the relations of the parties, because Kent's duties, that is what he was to do for the company, in the way of receiving and storing its oils and gas, and how he was to sell them and upon what terms, and as to how he should report his actions, etc., were all fixed and determined in advance by the contract itself, and he was, therefore, directed and controlled in the performance of his duty under the contract by the provisions thereof.

We think that the case of United States Fidelity & Guaranty Co. v. Lowry (Tex. Civ. App.) 231 S. W. 818, is very similar in its facts to the facts of this case. In that case Lowry was a traveling salesman for the Tom Padgitt Company of Waco, and was injured by his automobile overturning while soliciting orders for his company, and died from the injuries so sustained. The insurance carrier in that case denied liability to Lowry's wife, who claimed compensation under the Texas act, on the ground that Lowry was not an employé in contemplation of the act; but the Austin Court of Civil Appeals reached the conclusion that he was such an employé of the Padgitt Company, and in the opinion the reasons for the conclusion reached are stated in full. It would serve no useful purpose for us to discuss the facts in that case, and we therefore do not do so, but feel sure that the facts in that case were no stronger in favor of the claimant on the question as to whether Lowry was an employé than they are in this case. It is the contention, however, of able counsel for appellant in this case, that the Lowry Case, if it supports appellees in this case, was overruled by the later deci-

sion of the Commission of Appeals in the Shannon Case, supra. We do not think so, and we further think that the opinion in the Lowry Case is sound, as applied to the facts upon which it is based. It does not appear from the opinion in that case whether or not it ever reached the Supreme Court, nor have we been able to ascertain otherwise whether an application for writ of error was applied for, and if so, what action was taken by the Supreme Court on the application. It is a very similar case on its main facts to the instant case, and we are content to base our conclusion in this case upon the opinion in the Lowry Case.

[3] Appellant's next contention is that there was no evidence adduced upon the trial showing that Kent was acting within the scope of his employment for the Gulf Refining Company at the time he met his death, and that therefore the judgment was wrong and should be rendered in appellant's favor. We have carefully examined the statement of facts in this case, which is not very lengthy, and have concluded that the evidence was sufficient to warrant the finding that Kent was acting within the scope of his employment at the time he was killed. The substance of the evidence may be stated to be: Kent was last seen alive about 7 o'clock p. m. on December 6, 1923. It was then dark, and he was coming from the warehouse of the Gulf Refining Company, which is located near the Santa Fé depot about a mile east of the main portion of the town of Jasper. He was riding in a Ford automobile truck that he regularly used in making sales and deliveries of the Gulf Refining Company's oils and gases from the warehouse at Jasper, and was traveling the road leading from the warehouse towards the town of Jasper. The evidence shows that the business portion of the town of Jasper is about a mile west of the warehouse and depot. At this hour, 7 o'clock; Kent was traveling in the truck at a slow rate of speed, and was about a quarter of a mile west of the warehouse.

On the morning of the 7th of December following, the truck in which Kent was riding the night before was found turned over on the side of the road and in a ditch of water, and Kent was under the truck, and was dead. There was an oil barrel or drum made of metal that had fallen out of the truck into the ditch of water, but whether this drum contained oil or gas or was empty is not rendered certain from the evidence. One of the witnesses testified that from the position of this drum or barrel as it floated upon the water of the ditch, it was his opinion that it was not empty, but that it must have had a gallon or two of oil in it. This barrel or drum found under the truck was the property of the Gulf Refining Company, and if it was an empty one, it was Kent's duty to take care of it and save it for the company,

and to return it to that company under the terms of his contract. On Tuesday following the discovery of Kent's body on Friday, another witness made further investigation at the place of accident, and by fishing in the water of the ditch found an empty 10-gallon oil can, and also a wrench and a pump that was regularly used by Kent in the sale and delivery of oil for the Refining Company. In addition to these facts, it was shown that about 6 o'clock on the evening of December 6, 1923, which, as we have stated, was the date on which Kent met his death, he delivered 50 gallons of oil to a small merchant about half a mile southeast of the town of Jasper proper, and this oil was contained in five 10-gallon cans, and they were emptied at the purchaser's store and the empty cans put back in Kent's truck when he left the store. Kent was next seen about 6 o'clock at the postoffice at Jasper, which is about the center of the town, and he got his mail out of his box at that time. He was riding in a truck at the time, but the witness who testified to his presence there at that hour did not know and did not look to see what Kent had in his truck at that time, if anything. Shortly after leaving the post office, Kent was seen near the warehouse on the road leading from the town of Jasper to the warehouse and depot, and was in a short distance of the warehouse at that time, and was going in that direction. What he was going to the warehouse for is not shown by any positive evidence, but the circumstances strongly indicate that he was going to the warehouse, either for the purpose of storing empty containers or to procure more oil, and, as we have shown, it was about 7 o'clock when he was last seen on the road leading from the warehouse toward the town of Jasper.

[4] Mrs. Kent testified by deposition, and among other things she stated that about 6 o'clock on the day of Kent's death he came home, and she told him that the Gilmer Lumber Company, located near Jasper, had phoned to him that there was an order in the mail for some oil to be sent by Kent to the Gilmer Lumber Company, and further testified in that connection that Kent thereupon stated that he would go and get his mail, or words to that effect, and see about the order. According to this witness, Kent did immediately leave home, and Mrs. Kent never saw him again. This testimony on the part of Mrs. Kent was objected to by appellant on the ground that it was hearsay, both as to what she told Kent and the reply he made. The court overruled the objection, and appellant saved its bill. We think the testimony was not hearsay, in the sense that that term is usually understood, and further believe that it was relevant as a circumstance tending to show that Kent was performing services within the scope of his employment with the Gulf Refining Company at the time he met his death. If Mrs. Kent told him that there was an order in the mail for oil, or that she had been so informed, it was a circumstance indicating that Kent went to the post office to ascertain what the order was and to comply therewith. As a matter of fact, it is admitted by both parties that the order from the Gilmer Lumber Company mentioned by Mrs. Kent was in the post office on the next morning when Kent's dead body was found. The statement by Kent to his wife, if he made it, that he would go and see about the order, was admissible, we think, and not subject to the objection that it was hearsay. It was in the nature, as the appellate courts say, of a verbal act on his part. It was a statement by him accompanying his departure from home at the time, and would be a circumstance to indicate that he was then in pursuit of his oil business, under his contract with the Gulf Refining Company.

We think the circumstances that we have mentioned are sufficient to warrant the conclusion reached by the jury that Kent was in the course of his employment, or performing services for the Gulf Refining Company at the time he met his death, and especially so since there isn't a scintilla of evidence in this record to indicate that he was engaged in any individual business for himself at the time he met his death.

These conclusions dispose of all contentions made by appellant in its brief, with the exception of one, which was waived at the oral argument, and it follows that this court is of the opinion that the judgment should be affirmed, and it has been so ordered.