## LUMBERMEN'S RECIPROCAL ASS'N v. CARTER et al. (No. 1848.)

Court of Civil Appeals of Texas. Beaumont. June 29, 1929.

Rehearing Denied July 10, 1929.

T. B. Hamilton, of Hemphill, and Andrews, Streetman, Logue & Mobley, of Houston, for appellant.

Sanders & McLeroy, of Center, E. P. Padgett, of Hemphill, and F. G. Vaughn, of Beaumont, for appellees.

HIGHTOWER, C. J. This suit was filed by appellant, Lumbermen's Reciprocal Association, against the appellees James R. Carter and E. P. Padgett, in the district court of Sabine county, to set aside and cancel a final ruling and decision of the Industrial Accident Board of this state made in favor of the appellees under the provisions of the Workmen's Compensation Act of this state. The appellees answered by general demurrer and general denial, and, in addition, filed the usual cross-action in such cases. Trial was had with a jury, whose verdict was in response to special issues, and the judgment rendered by the court upon the verdict was in favor of James R. Carter for compensation at the rate of $10.38 per week for a period of 401 weeks, to be paid in a lump sum aggregating $3,508.-25. One-third of this aggregate amount was adjudged to be paid to Carter's attorney, Hon. E. P. Padgett. Appellant's motion for new trial having been overruled, it prosecuted this appeal to this court.

It was the contention of the appellee James R. Carter, in his cross-action, that he was an employee of the Temple Lumber Company on October 24, 1927, in Sabine county, and that on that date he received injuries in the course of his employment and while performing the duties thereof which resulted in permanent total disability. Appellant answered the cross-action by general demurrer, several special exceptions, general denial, and by special averment to the effect that Carter was not an employee of the Temple Lumber Company at the time he received his injuries, as alleged by him, but that he was an employee of one Gilbert Hogan, who was an independent contractor, and that appellant was not liable for the injuries received by Carter. This is a sufficient statement of the pleadings for the disposition of this appeal.

At the commencement of the trial in the court below it was agreed between the parties to this suit that appellant carried insurance under the Workmen's Compensation Act of this state covering all employees of the Temple Lumber Company, as the term "employee" is defined in the Workmen's Compensation Act (Rev. St. 1925, arts. 8306—8309), and that the policy of insurance was in effect on October 24, 1927, the date on which Carter received his injuries. It was further stipulated and agreed by the parties that all steps necessary to confer jurisdiction upon the trial court to hear and determine this suit were duly taken, which dispenses with the necessity of making further statement in that connection.

Appellant presents in its brief several assignments of error and relevant propositions thereunder challenging the judgment in this

case, the most vital of which are its first, second, third, and fourth propositions, by which it is contended, in substance, that the evidence in this case showed without contradiction that the appellee James R. Carter was not an employee of the Temple Lumber Company at the time he was injured, as claimed by him, but that, on the contrary, the evidence showed that Carter was an employee of Gilbert Hogan, who was an independent contractor, and that therefore appellant, as insurer of employees of the Temple Lumber Company, is not liable for any injuries received by James R. Carter. Since this contention is the most vital question presented on this appeal, and since we have concluded that it must be sustained, we shall let this opinion show fully the evidence bearing upon the question as to whether or not James R. Carter was an employee of the Temple Lumber Company at the time he was injured, as claimed by him.

The undisputed evidence shows that James R. Carter, at the time he was injured on October 24, 1927, was driving a motortruck loaded with pine logs which were being hauled from the woods in Sabine county and unloaded from the truck at a certain point on the tram railroad of the Temple Lumber Company. The logs belonged to the Temple Lumber Company, and had been cut from a certain tract of land in Sabine county called the Fullen tract. The distance of the haul was about 6 miles, and, when the logs were unloaded along the tram railway of the Temple Lumber Company, they were scaled by a man who was an employee of the Temple Lumber Company, for the purpose of ascertaining the number of feet contained in the logs. The evidence showed without dispute that James R. Carter, on the morning that he was injured, had made two trips from the woods where he picked up the logs to where he unloaded them on the Temple Lumber Company's tram railway, and that on the second trip the accident occurred which resulted in his injuries. He was employed the evening before this accident happened by Gilbert Hogan to operate the motortruck and haul those logs, and was to be paid by Hogan for his labor $3 per day.

We shall now set out fully the testimony of all the witnesses bearing upon the question as to whether Carter was an employee of the Temple Lumber Company at the time he was injured, as the term "employee" is defined in our Workmen's Compensation Act.

Mr. Carter was the first witness placed upon the stand whose testimony touches this question. He testified as follows:

"I unloaded those logs under the direction of Mr. Gayer, the scaler. He is a man that has been scaling logs and working for the Temple Lumber Company. He scales logs on the track for them, at the point where I unloaded these logs. Mr. Gayer did not show me where to unload those logs, but he told me, and I followed his instructions. He told me that the public road ran out, I reckon you would call it north by Mr. Everett McGown's, and it hit the highway by Ben Bowen's place, and then I would take the highway and come back to the Temple tram road or railroad, where it crossed the highway, and turn out on the east side, and they had a log truck on the cut off and to unload the logs on the other side of the track, and unload them straight just as I always did for Mr. Coley Gary. Yes, Mr. Gayer told me that, and he told me not to get them within four or five feet of the track. He told me that on a day that I went out there looking for a job. I met up with him and Mr. Gilbert Hogan at the place where they had the logs yarded, and he recommended me to Mr. Gilbert Hogan for a good hauler. He told me to take out that road by Mr. Everett McGown's, of course.

"As to what day I went to work for Gilbert Hogan, well, it was on October 24th, 1927, in the morning. Mr. Hogan was the man that I made the trade with, but he told me that the money would come out of Temple, and that I would get my money every two weeks from the Temple office. He told me he would pay me $3.00 a day to haul the logs but the money come from Temple and I would get it every two weeks out of the office. No I did not get paid the $3.00 for the day I worked out there; I never got nothing. I didn't ask for it.

"I really couldn't say whose truck it was I was driving at the time I got injured; Mr. Hogan had it in charge. When he hired me and told me he would pay me $3.00 a day I went out to where they were hauling logs from. He told me where the truck would be. He told me where to go, yes sir. When I got out to where the logs were cut there was another Hogan out there—his brother, I believe—and several other men. This here Hogan that was out there turned the truck over to me, I think.

"As to what tract of land the logs were being hauled from, well, the logs were yarded right in front of Mr. Tilley's house. Mr. Hogan said it was the Temple Lumber Co. logs. They were yarded out by the side of the road lying in front of Mr. Tilley's house. When I got out there I went and asked Hogan where the truck was that I was to drive, and he said 'Setting out there by the side of the road'. He told me as soon as he got the timbers out he would come and show me the truck and turn it over to me and go and load it. He did that, yes sir; I asked him if he was going to put on those logs by the side of the road, and he said he would come up in the yard, on the hill in front of Mr. Tilley's house. I drove the truck up there and the logs were loaded on the truck, yes sir. He didn't tell me anything more. He didn't tell me where to take the logs. I knew where to take them because Mr. Gayer had told me a few days before. We loaded the logs in front

of Mr. Tilley's, and the best I remember the road turns and runs north until I get by Everett McGown's house, and then we hit the highway. No, that was not up there by a railroad track; we run kind of north—I won't be positive about the direction, but it went up and hit the highway close to Ben Bowen's place, and come back through Milam and come to the railroad track between here and Milam, just the other side of Mr. Eli Low's place I believe. Yes, when I got up there I saw some other logs unloaded on the ground off the track of the railroad. I knew where to put those logs. Mr. Gayer had done told me. That was my first trip down there. No, I didn't go up to the railroad track and ask Mr. Gayer where to put the logs. I went in there looking for a job and I met up with Mr. Hogan and Mr. Gayer was right in the road where the teams had come up with the logs, and Mr. Gayer recommended me to Mr. Hogan as a good hauler, and Mr. Hogan said he needed some trucks and commenced to talking to me to try to get me to put a truck on the job, and Mr. Gayer said would I put a truck on there as the Temple Lumber Co. had to get through and they couldn't hold it with that team, and I asked him how long the job would last and he said between thirty and sixty days, and Mr. Gayer said he would get all the trucks he could, and I kept asking Mr. Hogan about a job of driving the truck and he told me a boy was driving the truck he was operating and if I had been there that morning I could have went to work, but to come back later on and see if I decided to put on a truck, and I told him I wasn't able to put one on for a 30 or 60 day job and so Mr. Hogan says they had promised him a job somewhere else and he said he didn't know as he would take that, as it was uncertain. When I first went out there Mr. Gayer told me Temple Lumber Company wanted trucks enough to move that timber. He told me if I had a truck or I could get one I could go in there and haul logs and I told him I didn't have any at present. It was after that I went out to Mr. Hogan's and hired. I didn't go to work for Mr. Gayer at that time; I didn't have any truck. I unloaded the logs on the spur track. I said I didn't know who the truck actually belonged to."

W. H. Jones was the next witness, and testified as follows:

"Yes, I remember the tract of land that was being logged during the time Mr. Carter was hurt; it was the J. W. Fullen tract of 160 acres. I know about the contract that was entered into between the Temple Lumber Company and Gilbert Hogan for the hauling of these logs. I was present when that contract was made by myself and Mr. Pollard. We were together. We made the contract with Mr. Hogan to turn all the rest of this tract of timber over to him to deliver on the track; pulled all four teams off, and moved out and turned it over to him. The Temple Lumber Co. had teams on there before that time on the first starting of the haul, but we got short of steel and had to move the company teams out in order to log the mill, and we pulled off all other trucks and turned the whole tract over to Mr. Hogan. The terms of the contract were that he was to deliver those logs on the track at so much a thousand feet, and he was to haul the logs. I don't remember exactly what the first contract was, that is, when we first turned it over to him, but I think it was $7.00—but on the wind-up we paid him $7.25. Under the contract Mr. Hogan was to furnish the equipment, and trucks and teams to haul the logs. Mr. Hogan accepted that contract and went to work out there.

"I am the woods foreman for the Temple Lumber Company. During the time he was hauling logs off that tract, I did not exercise a bit of control or direction over Mr. Hogan. After the contract was made it was all left up to Hogan to deliver the logs on the track, and they were scaled. I did not give him any instructions how the logs were to be hauled out. I did not know who was employed by him; it wasn't any of my business—that was up to him. The Temple Lumber Co. did not pay these employees of Mr. Hogan.

"I think that contract must have been entered into along in August some time; I don't remember the exact date, but it was not far from that time. It was somewhere about the first part of August or the last part of July last year. I don't remember exactly the date of this accident. Mr. Hogan I think wound up in October some time; I don't remember the exact date. I did not go around on the track and direct Mr. Hogan or any of his men as to how those logs were to be picked up and loaded, nor did anyone under me. The Temple Lumber Co. did not furnish Mr. Hogan with any truck to do that; they didn't furnish him anything.

"Q. Did you make the contract with Mr. Hogan in order to escape liability on the insurance matter?

"A. I did not. We made that contract because we needed the timber hauled. We made it to get the timber on the track. Mr. Gayer scaled that timber. His duties out there were scaler. He scaled on the skidway down to the railroad track, yes sir. He didn't supervise where the logs were to be put, because they were put on the track for him to scale. I had him down there to scale the logs strictly. No, we could not have used the logs out in the woods. When you suggest that if they had undertaken to unload the logs in the woods, it would have been his business to make them put the logs on the track—well, he wasn't supposed to touch them until they put them on the track. If he put them fifty feet out from the track that wasn't his busi-

ness—his job was to scale them. The logs were not to be scaled until they were put on the track. Gayer scaled all the logs on the skidway, and the saw foreman scaled the timber when it was cut.

"No I did not see Mr. Carter out there about that time; I didn't pay attention, because I didn't have any business up there. After I contracted with Mr. Hogan I was looking to him strictly. We never made any written contract. It was like we made all of them; we agreed on this haul and at this price. Yes, the Temple Lumber Co. make verbal contracts. They never made any written contract with a contractor that I ever knew anything about."

"Q. So if they made one in this instance you don't know anything about it?

"A. Well me and Mr. Pollard were talking with Mr. Hogan about the haul, and made the agreement with him at this price. Me and him never drawed up any contract; we just merely agreed on the price and the haul to be delivered."

"Q. Is $7.00 and $7.25 a thousand a large or small sum for hauling logs?

"A. It is a right smart sum. It was a pretty good price, and more than usual. As to what we take into consideration in arriving at such prices, well, a man can tell about what he can haul, and how many trips he can make, and there is the distance. I judge in this case Mr. Hogan must have been hauling those logs about six miles, or maybe a little further. If they hadn't taken up that steel he would have had to haul them between three and four miles. I think Hogan commenced hauling on the end of the steel, and hauled some until they pulled the company teams off, and after that we turned the whole thing over to him and let him handle the rest, and he done his own hiring and handled his own crew. I suppose Mr. Hogan owned the truck that Mr. Carter was driving at that time. It did not belong to the Temple Lumber Company.

"I know it didn't belong to the Temple Lumber Company because they haven't got any log trucks over here, and never did have. Yes, they have some trucks, and transport men back and forth to work. We abandoned that contract work because the company bought teams; it is more profitable not to have it, and we can make more money, yes sir. We made that contract with Hogan because he had been working for us a good long while and wanted a job, and I suppose he wanted to make some money. We had a few more teams hauling at the time, but they went to hauling for Mr. Hogan, I think.

"I think our mill is 100,000 ft. capacity. It takes lots of logs to keep it supplied with timber. No, Hogan wasn't the only man of that class we had, and the only one we have had since then; we have had a contractor since.

"The contract expired when the timber was hauled. When we were through hauling the contract expired. I don't remember if we used him any more or not."

The next witness offered in this connection was Gilbert Hogan, who testified as follows:

"My name is Gilbert Hogan. I am a logging contractor, and in the last six months of 1927 I was logging contractor for the Temple Lumber Company. I have hauled logs for them, and entered into a contract with them to haul logs off the Fullen tract. That was sometime in the summer; I think it was about July. I made the contract with Mr. Bill Jones and Mr. Pollard. Mr. Jones is the woods foreman of the Temple Lumber Co. I had made other contracts with him before that time. If I understand it, that was just a verbal contract. I was to haul the logs and put them out on a spur track. Temple Lumber Company was to cut the timber and pay me for hauling them. It seems to me they paid me $7.00 a thousand. I furnished my help and hired my help. I furnished the trucks and tools and teams necessary to haul the loss. None of the equipment or trucks belonged to the Temple Lumber Company that I used. I have worked different numbers of men out there; there were three to four, and along like that.

"As to what the Temple Lumber Co. did in directing or controlling me, or telling me how to load and haul those logs, well, they didn't have anything more to do with it after I contracted with them, no more than they cut the timber and of course they scaled it after I put it on the track, and paid me for it. They did not have any control over me; they didn't bother me at all, and none of their agents exercised any control or direction over me.

"I know Mr. James R. Carter. I know when he had an accident out there in which he was hurt. He was working for me at that time. The first time I talked with him about a job, the best I can recollect, was about three weeks before he went to work for me. He asked me for a job and I told him at that time I didn't have any opening for him. And later on, in two or three weeks, he came to my house on Sunday afternoon, him and Mr. White, and asked me for a job, and I hired him Sunday afternoon and he went to work for me Monday morning. He was driving when he had the accident. I was paying him $3.00 a day. He worked for me; I hired him for that purpose. The work that he did was on the piece of timber that I had contracted to haul the logs off. I paid the men that were working for me, myself. The Temple Lumber Company did not pay those men. I never have paid Mr. Carter for that day's work. He never asked me for it. The Temple Lumber Co. never paid any of the men that were working for me, while I was trucking that tract of land. Some of the men at that time would go to the company's store and draw on the Temple Lumber Company, that is, I would give them orders on

the Temple Lumber Co. store. I have got money for them through the store manager, Mr. McMaster; and then I would give them orders there for groceries, and things like that. Those things were charged to my account. The orders and things of that sort I gave on the store, were taken out from the amount due me under the contract.

"I did not carry any insurance at that time to cover the men working for me. The Temple Lumber Co. did not deduct anything for insurance for the men, that I know of. I did not collect anything for insurance from the men who were working for me. I am working for the Pickering Lumber Company at this time."

At this point the witness W. H. Jones was recalled and further testified, as follows:

"Mr. Hogan went ahead with the hauling until he cleaned the logs up off that tract of timber. He was still hauling those logs under that contract at the time Mr. Carter was hurt. I wasn't up there when he got hurt.

"It was the Fullen tract of land that Mr. Hogan was hauling the logs from. I don't remember when Mr. Carter was hurt. If Mr. Hogan was logging the Fullen tract on the day that Carter was injured, that contract that I entered into with him in July was still in existence."

The next witness in this connection was W. C. Smith, who testified as follows:

"I know Gilbert Hogan. He was an employee of the company in 1927 in the capacity of contractor. We carried him on the books as a contractor. I have a statement here of what Mr. Hogan was paid by the company in 1927, I made that myself. I have it itemized month by month; the total amount paid him was $10,842.89. That was paid him by the Temple Lumber Co. in 1927. Month by month the amounts are: July, $1,193.25; August, $1,566.30; Septem., $1,411.05; October, $950.90; Novem., $1,860.00. Those amounts were paid Mr. Hogan for delivering the logs on the track. Personally I could not say that I know Mr. Hogan had men working for him. We did not carry any employee of his on our payroll—none whatever.

"We did have a man by the name of James R. Carter on the company payroll during 1927. We have a number of men on our payroll; we have approximately 400 each month. We have our own employees on our payroll.

"As far as our books reflect we do not owe Mr. Carter any money; nor does the Temple Lumber Co. owe Mr. Hogan any. I know what arrangements Mr. Hogan had for his employés to get stores etc., from the commissary. He would give orders into the store and have the items charged to his personal account, and then the store would come on over there and draw it against Mr. Hogan, but who the orders would be for I would not know. The amounts were charged to Mr. Hogan on the books of the company.

"I issue the trading checks myself, for the Temple Lumber Company. I did not issue any trading checks to any employees of Mr. Hogan."

The next witness in this connection was I. J. McCook. He testified as follows:

"I am bookkeeper for the Temple Lumber Co. at Pineland, and was such in 1927. I make up the monthly reports in connection with the insurance policy under the Workmen's Compensation Law, that the Temple Lumber Company has with the Lumbermen's Reciprocal Association. The idea of doing that is to determine the amount of premium due. It is based on the payroll, and the amount of labor. In 1927 Gilbert Hogan's time was turned in at the Hemphill office, and that was sent to me, in turn. That was turned in to me under the classification of logging contract.

"For the months of August, September and October of 1927 I did not report the amount paid to him by the Temple Lumber Co. in the monthly payroll statement that was made for the Lumbermen's Reciprocal Association. The Temple Lumber Company did not pay a premium to the Reciprocal Association for those months for the amounts paid to Gilbert Hogan, because they were not included in my report."

The next witness in this connection was H. E. Gayer, who testified as follows:

"My name is H. E. Gayer. I am with the Temple Lumber Co. handling teams and in charge of the hardwood department. Up to some time this year my duties were general scaler for the Temple Lumber Co. I covered all the logs hauled that were hired hauled, or what we commonly call contract hauls—that is, logs that the company did not haul, or such as were bought by the company f. o. b. track, for both the Pineland and the Hemphill mills.

"I know Gilbert Hogan. In a general way I am familiar with the terms of the contract between the company and Hogan, on the Fullen tract. I scaled the logs that Hogan hauled. I scaled them on the skidways on the tram of the Temple Lumber Co. across the highway leading from here to Milam.

"Q. What direction or control did you exercise over Mr. Hogan or his men while he was hauling logs off the Fullen tract, if any?

"A. I scaled the logs; it was my duty to scale the logs and turn into the company such logs as I scaled. It was on my scaling that the amount was paid to Mr. Hogan. He scaled the logs, or had them scaled. As to whether there was any way to find out the amount of feet in each log as scaled by Mr. Hogan, when I scaled the logs at the skidway—usually the contents were written on the end of it; sometimes we agreed and sometimes not. I never gave Mr. Hogan or any of his employees on the Fullen contract any orders or direction in regard to the hauling of the logs.

"We didn't have anything to do with Mr.

Hogan's payroll. I told him and a number of others that Mr. Hogan wanted a number of trucks. No, I wasn't interested in that for the company, only a friendly interest to Mr. Hogan. He asked me, as I went around, to tell people that he had a job up there for trucks. We need the steel on that line beyond the point we were putting the logs, and that was one of the reasons we contracted that piece—to hurry up the job. Oh yes, it is a fact that we were in need of that steel. We didn't have special interest for the steel to the east, but we did to the west. Yes, that was over on the other side. The reason that we contracted with Mr. Hogan and gave him practically double the price was to release about two miles of steel west, and he hauled to that point. We needed the steel for relay, yes sir—and I have reference to the west of that tract.

"Q. Those logs were hauled by Mr. Hogan, who went there and scaled them, and had them picked up, and were reported by the scaler to the mill, and the company settled on the basis of your scale, always?

"A. They did.

"It has been the custom for contractors in hauling logs to be required to deliver the logs within 45 feet of the track, and I consider that a part of every contract because that is the distance at which it is practical to reach a log, with a loading line. If the contractor or his men delivered the logs more than 45 feet from the track I would speak to the contractor. However, I have a way of speaking that is usually more effective than talking. I just don't scale, and they come in then. We load out to those logs and leave them, and when they place them within the limit we scale them and give them their pay. That is the most efficient way I have found to make them deliver up to the distance. If I had to watch every man who came in with ten to fifteen trucks, I wouldn't go to him; it would be impractical. It would be up to the contractor if he wanted me to scale them."

The foregoing testimony, as we have quoted it, is all the evidence in the record which has any bearing upon the question as to whether or not the appellee James R. Carter was an employee of the Temple Lumber Company, as the term "employee" is defined in our Workmen's Compensation Act. This testimony summarized shows the following: That some time in the month of July, or early part of August, 1927, the Temple Lumber Company entered into a verbal contract with Gilbert Hogan, by the terms of which Hogan agreed to haul from the woods certain pine logs owned by the Temple Lumber Company in Sabine county and deliver them at a point on the Temple Lumber Company's tramroad where they were to be sealed. These logs were cut from what is known as the J. W. Fullen 160-acre tract of land. Mr. Hogan,

under the terms of the contract, was to furnish all trucks, men, and equipment necessary to carry out his part of the contract, and he was to be paid by the Temple Lumber Company $7 per thousand feet for all the timber hauled from the Fullen tract and placed at a point on the Temple Lumber Company's tramroad. Hogan was not under the direction or control or supervision of the Temple Lumber Company in hauling and delivering these logs, nor were any of his men, and, so far as the evidence in this record shows, the Temple Lumber Company had no concern or interest in the means or methods adopted by Hogan in carrying out this contract other than the result; that is to say, getting the logs from the woods, where they were cut, delivered to the Temple Lumber Company's tramroad so that they might be transported to the Temple Lumber Company's mill. This testimony shows that the several men, three or four, that were used by Hogan in the capacity of truck drivers in doing this work, were employed, or hired, by Hogan himself, including the appellee Carter, and that Hogan was to pay these men, especially Carter, $3 per day for their services in driving the trucks used in delivering these logs from the woods to the tramroad. The testimony further shows that all the trucks and other equipment that were used in this work were owned or furnished by Hogan himself, none of it belonging to the Temple Lumber Company nor furnished by the Temple Lumber Company. It shows further that Hogan's name appeared and was carried upon the books of the Temple Lumber Company as a log contractor, and that none of the men employed by him in doing this work were carried upon the books of the Temple Lumber Company as employees of that company. None of these men were hired by the Temple Lumber Company, and none of them ever received any pay for the work they did for Hogan from the Temple Lumber Company. The large amounts of money that were paid by the Temple Lumber Company to Hogan during the months of July, August, September, October, and November, 1927, strongly indicate and tend to sustain appellant's contention that Gilbert Hogan was an independent contractor in hauling the logs at the time James R. Carter received his injuries. It is true that Mr. Carter testified, as we have shown, that Gilbert Hogan told him at the time he employed him on this job that the money for his services would come out of Temple and would be paid every two weeks, and we shall assume that Hogan made this statement to Carter, but the question still remains, was the evidence, as a whole, sufficient to warrant the finding which the jury made, in effect, that the appellee Carter was an employee of the Temple Lumber Company at the time he received his injuries?

In the case of Shannon v. Western

Indemnity Co., 257 S. W. 522, it was held by our Commission of Appeals, and the holding approved by our Supreme Court, that an employee, under our Workmen's Compensation Law, means every person in the service of another under contract of hire, and includes all those engaged in the service of another, whether in the performance of manual labor or the positions of management or trust, and whether being paid wages or salary, so long as they remain under ultimate control of the employer; that an independent contractor is any person who, in the pursuit of an independent business, undertakes to do a specific piece of work for other persons, using his own means and methods, without submitting himself to their control in respect to all its details.

In Kirby Lumber Co. v. McGilberry, 205 S. W. 835, this court held that, where a contract provided that the buyer of timber should reimburse the seller for wages paid scalers, not to exceed $50 per month each, a scaler employed by, and who worked under the direction of, the seller, was not a employee of the buyer within contemplation of the Workmen-Compensation Act.

In the case of Texas Employers' Insurance Association v. Owen, 298 S. W. 542, our Commission of Appeals held that the test in determining whether a person injured is an employee or an independent contractor is whether the employer had and exercised control over him in prosecution of his work; that a contractor is a person who, in pursuit of an independent business, undertakes to do a specific piece of work for another, using his own means and methods, without submitting himself to the other's control in respect to all its details, and who represents the will of his employer only as to the result of his work.

In the case of Tilling v. Indemnity Insurance Co. of North America, 283 S. W. 565, the Galveston Court of Civil Appeals held that a night watchman furnished by a detective agency, which retained entire control and direction over the night watchman and paid his wages, was not an employee of the person to whom the watchman was furnished.

In the case of Maryland Casualty Co. v. Kent, 271 S. W. 929, this court again had occasion to note the difference between an employee, in contemplation of our Workmen's Compensation Act, and an independent contractor, and we there discussed the question at some length.

▪ Applying the rule or test laid down by the authorities just cited, which must govern in determining whether a person is an employee in contemplation of our Workmen's Compensation Act, or an independent contractor, we are constrained to hold that the evidence in this case, as we have shown it already, seems to us to show overwhelmingly

that Gilbert Hogan was an independent contractor, as claimed by appellant in this case, and that the appellee James R. Parker was his employee and not an employee of the Temple Lumber Company and that the finding of the jury in this case to the contrary is not sustained by the evidence found in this record, and that, for that reason, the judgment in this case must be reversed and the cause remanded.

▪ The record in this case shows that the trial court found as a fact, though the issue was not submitted to the jury, that the appellee's average weekly wage was the sum of $17.30 and this finding is challenged by appellant on the ground that there was no evidence supporting it. We sustain this contention. The undisputed evidence in this case shows that, at the time Mr. Carter received his injuries he had only been working a part of one day and that he was to be paid as his daily wages $3 per day. There was no attempt to show what any other employee doing like work in the same vicinity earned as weekly wages for a period of one year, and the record strongly indicates that the work that Carter was doing was not of a temporary nature, but was such work as is regularly and constantly done in the vicinity where he was injured. Therefore, this case comes within the holding of the Galveston Court of Civil Appeals in the case of Texas Employers' Insurance Association v. Villarreal, 1 S.W.(2d) 692. Our conclusion here is not in conflict with our holding in United States Fidelity & Guaranty Co. v. Morgan, 18 S.W.(2d) 810, recently decided by this court.

The jury, in response to a special issue, found that appellee's injuries resulted in permanent total incapacity, and appellant challenges the sufficiency of the evidence to support that finding. We have no hesitancy in overruling this contention, and think that the evidence was abundantly sufficient to warrant the jury in that finding.

Appellant further contends that the jury's finding to the effect that the compensation for his injuries should be paid to the appellee in a lump sum is not sustained by the evidence. We overrule this contention, and hold that the evidence was abundantly sufficient to warrant that finding. If there shall be another trial of this case, the court should be guided by the authorities hereinbefore cited as to the definitions of the terms "employee" and "independent contractor," and should define, by proper instructions to the jury, each of those terms as defined by the authorities above cited, and let the jury answer whether Gilbert Hogan was an independent contractor or whether he was an employee of the Temple Lumber Company on the date James R. Carter was injured. We think what we have said is sufficient to dispose of all questions before us which are

likely to arise upon another trial, and we therefore pretermit any further discussion of the contentions made by appellant. We decline to reverse and render the judgment in this case, as requested by appellant, because upon another trial the appellees may be able to strengthen their contention that James R. Carter was an employee of the Temple Lumber Company at the time he received his injuries.

The judgment is reversed, and the cause remanded.